# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 589 - 3, 6 | **DATE** | 7/24/2002 |
| **CASE TITLE** | USA vs. Fowobi George, Ola Mustapha | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant George's motion for judgment of acquittal or for a new trial (Doc. No. 149-1, 149-2) is denied. Defendant Mustapha's motion for judgment of acquittal (Doc. No. 150-1) and his motion for new trial (Doc. No. 151-1) are denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 6 number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUL 25 2002 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | 188 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | 7/24/2002 date mailed notice | |
| ETV | courtroom deputy's initials | 02 JUL 25 AM 8:28 Date/time received in Central Clerk's Office | ETV mailing deputy initials | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 00 CR 589-3 |
| | ) | |
| FOWOBI GEORGE | ) | Judge Rebecca R. Pallmeyer |

**DOCKETED JUL 25 2002**

## MEMORANDUM OPINION AND ORDER

On February 21, 2002, a jury found Defendants Fowobi George and Ola Mustapha guilty on charges of check counterfeiting, bank fraud, and money laundering. Both Defendants have moved for a judgment of acquittal or for a new trial. In this opinion, the court sets forth its reasons for denying those post-trial motions. In addition, the court will address issues relating to Defendant George's sentencing.

## DISCUSSION

### I. Post-Trial Motions

Both Defendants' motions for acquittal or new trial focus chiefly on the sufficiency of the evidence. Such challenges are notoriously difficult, particularly where, as here, Defendants contend key witnesses were not credible. The court applies a standard that generously favors the jury's determination:

> The test that the court must use is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government . . . bear[ing] in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences."

*United States v. Reed,* 875 F.2d 107, 111 (7th Cir.1989), quoting *United States v. Marquardt,* 786 F.2d 771, 780 (7th Cir.1986). In this case, both Defendants focus their attention on the credibility of four witnesses, Jason Libson, Samsuideen Giwa, Biola Alawode, and Alyson Verploeg, three of whom (Libson, Giwa, and Alawode) were co-Defendants who pleaded guilty and cooperated with the government at the trial in this case.

A.  **Sufficiency of the Evidence -- Mustapha**

Defendant Mustapha was convicted of money laundering, bank fraud, and counterfeiting. He challenges the sufficiency of the evidence in support of each of the jury's findings. With respect to Count VIII, in which Mustapha was charged with money laundering, the government offered evidence that, soon after the arrest of another co-Defendant, Abiola Amin, Defendant Mustapha removed boxes of computer chips from Amin's home. Verploeg testified that she was in Amin's apartment at the time that Mustapha took the chips, and Alawode and Giwa described incidents in which Mustapha acknowledged that the computer chips were in his possession. Mustapha now argues that the testimony of these witnesses was largely uncorroborated. In fact, however, there was evidence that boxes and packing materials were found in the garage behind Amin's residence only a few hours after their contents were removed by Mr. Mustapha, and that those boxes and trays bore Mustapha's finger and palm prints. Phone records reflected that within days of Mustapha's removal of the chips, he had phone contacts with convicted co-Defendants Libson, whom he had never met before this, and Giwa, who had no significant prior contact with Mustapha.

The jury found Mustapha used these illegally obtained assets to make a $15,000 downpayment for the purchase of a 1998 Lincoln Navigator in August 2000. FBI Agent Laura Miller testified that Mustapha was present in the courtroom during proceedings involving Amin, were he could have learned that Amin himself obtained the chips through fraud. In any event, Mustapha's legitimate earnings for the year 2000 were at that time approximately $5,000, and his own records indicated he had purchased another car only three months earlier, at a much lower price, a portion of which he had to finance. This evidence, much of it independent of the witnesses Mustapha discredits, was sufficient to support the inference that Mr. Mustapha purchased the Navigator with illegally obtained assets. Although Mustapha suggested his cash deposit for the Navigator was less than $10,000, the government presented a receipt that bore notations reflecting two amounts: $9,000 and $6,000. Mustapha now argues that the court erred by declining to instruct the jury that

2

there were two separate cash transactions (Mustapha's Post-Trial Motion for a New Trial, at ¶ 8), but the court believes this is a matter of inference from the facts, which Mustapha was free to, and did, argue to the jury in closing. Finally, the government is not required to prove, as Mustapha now suggests it must (Mustapha's Motion for Judgment of Acquittal, ¶ 5), that Mustapha himself was involved in the illegal activity that generated the funds he used to purchase the car.

Mustapha was also convicted of bank fraud, charged in Counts XIII, XV, XVI, and XVII. The testimony in support of those counts came from Samuel Evans, Lecoylia Willis, Edward Bryan Phillips, and Shari Garland, witnesses whose credibility Mr. Mustapha does not challenge. Each of these witnesses described encounters in which Mustapha solicited them to negotiate counterfeit checks through their respective accounts. Except for Garland, each yielded to Mustapha's temptation, following his instructions regarding how and when to deposit the checks and then make withdrawals against the fraudulently-obtained assets.

Finally, Mustapha was convicted on a single count of check counterfeiting, Count XVIII. The check involved, in the amount of $45,999, was drawn against the account of co-Defendant Fowobi George's insurer, payable to Samuel Evans. Jason Libson testified that he created the check for Fowobi George; Mustapha argues that Libson's testimony was not credible (Defendant Mustapha's Motion for Judgment of Acquittal, at ¶ 6), but on cross-examination, defense counsel successfully demonstrated that Libson lied in prior testimony. The jury heard that impeachment but was entitled nevertheless to believe Libson. In any event, Samuel Evans, whose credibility Mustapha does not attack, testified that he received the check from Mr. Mustapha, with whom he had no prior relationship. Mustapha provided Evans with instructions on how and when to deposit and withdraw funds against it for delivery to Mustapha. This evidence was sufficient to establish that Defendant Mustapha had "possess[ed] . . . a forged security . . . of an organization, with intent to deceive another person . . ." in violation of 18 U.S.C. § 513(a).

3

## B. Sufficiency of the Evidence – George

The jury found Defendant George guilty of nine counts of check counterfeiting (Counts XII, XVIII, XIX, XX, XXI, XXII, XXIII, XXIV, and XXV) and two counts of bank fraud (Counts XVI and XVII). His sufficiency of the evidence challenges fare no better than did Defendant Mustapha's. First, as the government notes, his challenges to the credibility of witnesses Alawode, Libson, and Verploeg are requests that the court second-guess the jury's determinations, which is not permissible.[1]

Cooperating Defendant Jason Libson, a self-proclaimed expert in the "art" of creating phony checks, testified that George provided him with checking account information for a number of George's entities with which George transacted business, either individually or on behalf of the cleaning service Mr. George operated. As the government notes, common sense defeats the notion that coincidence could explain the fact that so many of George's business associated were victimized by identical criminal conduct during a short time frame. (Government's Consolidated Opposition to Defendants' Motions, at 4-5.) The jury was entitled to conclude that George was the source of information used to create counterfeit checks drawn on the accounts of several of his own business associates. The fact that George's business and personal finances were depleted furnished a motive for the charged conduct.

The jury returned a verdict against George concerning two of the checks used by Mr. Mustapha in a bank fraud scheme (identified in Counts XVI and XVII) and one check used by Mr. Amin in a mail fraud scheme (identified in Count XII). Jason Libson admitted manufacturing those three counterfeit checks, and his only connection with Mr. Mustapha and Mr. Amin was through

---

[1] In his post-trial motion, George reported he was investigating claims by other MCC inmates that Libson had told them he gave perjured testimony to incriminate George because he believed George had directed authorities to Libson. George promised he would seek a hearing if these claims were confirmed (George's Motion for Judgment of Acquittal, at 3), but to date has not done so.

4

Defendant George. Again, the notion that George had no involvement in the unlawful conduct would require remarkable coincidence.

### C.     Unavailability of Abiola Amin

Co-Defendant Abiola Amin pleaded guilty and received a significant sentencing reduction in return for his cooperation and truthful testimony. Shortly before the trial, Amin nevertheless recanted much of the testimony he gave before the grand jury concerning Defendant George's involvement in providing checks that Amin used to purchase computer chips. In his recantation, Amin asserted that George was the source, not of all, but of only one of the checks Amin had used in that scheme – that is, the counterfeit TCF National Bank check written to Neutron, Inc. in the amount of $262,000 (described in Count XII). As a result of the recantation, the government withdrew a number of the charges against George and withdrew Amin's name from its witness list.

Defendant George then sought to call Mr. Amin as a witness himself, although he had not identified Amin as his own witness nor had he taken any steps to secure Amin's presence. At the court's direction, the government arranged for Amin to be transported to the courtroom and be questioned outside the presence of the jury. On the advice of counsel, Amin exercised his Fifth Amendment right to decline to testify. In light of the fact that Amin had given contradictory sworn statements, one to the grand jury and another to a government officer, the possibility that his testimony might incriminate him was indeed genuine.

Defendant George asked the court to order the government to confer use immunity on Amin or, at a minimum. to require Amin to take the stand and invoke his privilege against self-incrimination in the jury's presence. The court denied those requests, and George argues this ruling was error. He urges that Amin's immunized testimony would constitute "*Brady* material" and that Amin's exercise of his Fifth Amendment privilege before the jury would "have formed the basis for impeaching Alowade and Verploeg whose trial testimony demonstrably tracked Amin's recantation." (George's Motion for Judgment of Acquittal or, in the Alternative, for New Trial, at 2.)

The court is uncertain what George means by his assertion that Alowade's and Verploeg's testimony "tracked Amin's recantation." As noted, because Amin recanted certain statements that incriminated George, the government withdrew those counts. Witnesses Alawode and Verploeg testified concerning only the one check that Amin continued to assert came from George. Further, the court does not share Mr. George's confidence that Amin's testimony would have helped him. All that the court is certain of is that Amin does not tell the truth. Even if the court were able to compel his testimony, neither Mr. George nor the prosecution could know which version of Amin's own previous statements (if any) he might offer from the witness stand. George could not properly call him merely to impeach his testimony, and the government's interests would surely not be served by putting a known perjurer on the witness stand.

In any event, the court had reservations at trial concerning the procedure proposed by George and, on further reflection, concludes it acted properly both in refusing to order the government to confer immunity and in refusing to require Amin to take the stand merely to assert his Fifth Amendment privilege. First, the law in this circuit is clear that the right to grant immunity to a witness is delegated "solely to the executive branch of government." *United States v. Taylor*, 728 F.2d 930, 934 (7th Cir. 1984), citing 19 U.S.C. §§ 6002, 6003; *accord, United States v. Hooks*, 848 F.2d 785, 798 (7th Cir. 1988) The government is not required to extend immunity to a defense witness, *Hooks*, 848 F.2d at 799, and trial courts have no power to direct the government to do so, absent "substantial evidence showing that the prosecutor's actions amounted to a clear abuse of discretion violating the due process clause." *Id.*, citing *United States v. Frans*, 697 F.2d 188, 191 (7th Cir. 1983) and *Taylor*, 728 F.2d at 935, . Nor is *Brady* implicated here; the government met its *Brady* obligations by promptly disclosing Amin's recantation. It also acted properly in withdrawing charges that Amin's conduct rendered it unable to prove.

George's alternative proposal – that the court direct Mr. Amin to exercise his Fifth Amendment privilege from the witness stand – is also foreclosed by case authority. Significantly,

6

Mr. George's co-Defendant, Ola Mustapha, vigorously objected to this proposal. The court expressed concern that the procedure proposed by George might suggest to the jury that Amin's unwillingness to testify supported a negative inference about his own character or conduct. The court doubted the propriety of any such suggestion in a criminal trial. As the court has now determined, it is in fact well-established that neither the government nor the defense may call a witness solely for the purpose of having that witness take the Fifth before the jury. *United States v. Castorena-Jaime*, 285 F.3d 916, 930-31 (10th Cir. 2002); *United States v. Swanson*, 9 F.3d 1354, 1359 (8th Cir. 1993); *United States v. Pitts*, 918 F. 2d 197, 200 (D.C. Cir. 1990); *United States v. Lyons*, 703 F. 2d 815, 818 (5th Cir. 1983). The purpose of this rule is precisely the one identified by this court at trial: " '[T]he jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense.' " *Castorena-Jaime*, 285 F.3d at 931, citing *United States v. Nunez*, 668 F.2d 1116,1123 (10th Cir. 1982); *Bowles v. United States*, 439 F.2d 536, 541 (D.C.Cir.1970).

Because Amin was not "available" to testify for the government, and there was no way to determine that his testimony would have been helpful to the jury, the court declined to give the "missing witness" instruction requested by Mustapha. (Mustapha's Post-Trial Motion for a New Trial, ¶ 7.)[2] Instead, the court opted to advise the jury, without any further elaboration, that Mr. Amin was not available to testify. The court continues to believe this was the appropriate course of conduct. *Cf. Harmon v. McVicar*, 95 F.3d 620, 623 (7th Cir. 1996) (prosecution had announced its intention to call two witnesses who later asserted the privilege against self-incrimination; on habeas review, court finds no prejudice from a jury instruction that the witnesses would not be called, where there was no mention of the witnesses' invocation of the privilege and the jury knew the witnesses had been convicted for the same offense for which petitioner was on trial). At a

---

[2] Mustapha's request for such an instruction is ironic, in light of his repeated and emphatic objection to Amin's being called as a witness by anyone.

minimum, the failure to permit Mr. George to call Mr. Amin to the witness stand does not support the request for a new trial.

### D. Mustapha's Renewal of Pre-Trial Motions

Defendant Mustapha has renewed his pre-trial motions, including his motion to dismiss the indictment, his motion to bar the testimony of the government's fingerprint expert, and a motion for attorney-conducted *voir dire*. (Mustapha's Post-Trial Motion for New Trial, ¶ 5.) The court stands by its pre-trial rulings. With respect to the motion to dismiss Count VIII, the court noted in a minute order that the government had explained the basis for its contention that Mustapha's purchase of the Lincoln involved more than $10,000; the jury has now reached that conclusion, which finds support in the evidence, as explained above. The court adhered to Seventh Circuit precedent in denying Mustapha's motion to bar the fingerprint expert. The court's written rulings on those motions are attached and incorporated here.

With respect to Mustapha's motion for attorney-conducted *voir dire*, the court is puzzled; this court routinely allows attorneys to conduct voir dire examination of potential jurors, even without a formal motion, and believes it followed that practice in this case.

Finally, the court required the prosecutor to explain its reasons for challenging one of two African-American jurors, and as stated in open court, was satisfied that the government's explanation for this challenge was not based on race.

## II. Sentencing Issues – Defendant George

As explained in the Presentence Investigation Report, the 1998 Sentencing Guidelines, in effect at the time of the offense conduct, were used because they yield a more favorable result for Mr. George than do the 2001 Guidelines. Specifically, the 2001 Guidelines eliminate a two-level enhancement for more than minimal planning (§2F1.1(b)(2)(A)), but direct a 14-level increase based upon the amount of intended loss resulting from all of Mr. George's offense conduct, three levels higher than called for under the earlier manual. See § 2B1.1(b)(1). Because the court must

8

use the Guideline Manual as a whole, see § 1B1.11(b)(2), the net effect is that the 2001 Guidelines would result in a total offense level of 20, one level higher than under the 1998 Guidelines.

Under those Guidelines, Mr. George's total offense level is 19 and his criminal history category is 1. Mr. George has had no prior convictions and has had a successful business and legitimate employment. Although the amount of intended loss is great, Mr. George's conduct actually resulted in a much lower amount of loss. The court concludes that a sentence at the bottom of the Guideline range of 30 to 37 months is appropriate. Mr. George has moved for a downward departure; he argues that his status as a deportable alien will result in more onerous conditions of confinement than a non-alien would face. The court declines to depart downward. Mr. George has been living and working in the United States for several years, and does not face the particularly harsh and lonely circumstances of an alien who has no contacts here and entered the country in connection with the offense conduct or just before his arrest. The court presumes he will have visitors, including family members and loved ones in the United States. At his request, the court will recommend placement in a "boot camp" setting. Particularly if that recommendation is accepted, the conditions of Mr. George's confinement will not result in unusual or exceptional hardship.

ENTER:

Dated: July 24, 2002

REBECCA R. PALLMEYER
United States District Judge